REINHARD *v.* GRAND RAPIDS SCHOOL EQUIPMENT CO.

1. CONTRACTS—ORAL CONTRACTS—COMMISSIONS—EVIDENCE—QUESTION FOR JURY.

In an action by a salesman on an oral contract for the payment of commissions on the sale of goods manufactured by defendant corporation, in addition to the salary paid, where the testimony was in dispute as to whether commissions were to be paid on other than school supplies and equipment, and as to whether the salesmen, one of whom was an officer and sales manager of defendant, were instrumental in securing government orders, the issues raised were properly submitted to the jury, as questions of fact.

2. SAME—WEIGHT OF EVIDENCE.

*Held*, that the verdict in favor of plaintiff was not against the overwhelming weight of the evidence.

3. TRIAL—ISSUES—INSTRUCTIONS.

*Held*, that the issues raised were properly presented to the jury.

4. CONTRACTS — PAYMENT — COMMISSIONS — ACCEPTANCE OF GRATUITY—EFFECT ON CONTRACT—NOTICE.

A statement by defendant's president, at a dinner given by the stockholders to the salesmen and bookkeeper, at which time checks were distributed to them as tokens of appreciation, with Christmas greetings, that no commissions were due the salesmen, if heard by plaintiff, would not have the effect of notifying him that if he accepted the check it was in payment of any claim for commissions he might have under his contract of hiring.

5. PLEADING—PAYMENT—AN AFFIRMATIVE DEFENSE.

In an action for commissions on a contract of hiring, the affirmative defense of payment, in order to be available, should be pleaded.

6. CONTRACTS — GOVERNMENT CONTRACTS — COMMISSIONS — PUBLIC POLICY.

An agreement by a corporation to pay its salesmen, one of whom was its officer and sales manager, a commission

for procuring government contracts, where it was not contemplated that any illicit methods or any corrupt influences were to be used, *held*, not void as against public policy.

Error to superior court of Grand Rapids; Dunham (Major L.), J. Submitted April 13, 1920. (Docket No. 51.)  Decided July 20, 1920.

Assumpsit by George F. Reinhard against the Grand Rapids School Equipment Company for commissions on the sale of goods. Judgment for plaintiff. Defendant brings error. Affirmed.

*Clapperton & Owen*, for appellant.

*Knappen, Uhl & Bryant*, for appellee.

STEERE, J.  Defendant brings this case here for review on numerous assignments of error against a judgment of some $16,000 obtained against it by plaintiff in the superior court of Grand Rapids, based on a claimed contract for commissions while a salesman in defendant's employ during the year 1917. The controversy involves the nature, validity and performance of plaintiff's contract of employment for that year. Defendant is a corporation owned and controlled by four stockholders, all officers and actively connected with it, named Schravesande, Fox, Fortier and Matheson. In 1913 the four men purchased a concern known as the Grand Rapids Screw Company, which was manufacturing a variety of special articles in the wood-working line, such as hand-screws, clamps, trucks, cabinet makers' benches, kitchen cabinets, equipment for manual training schools, etc. After acquiring the screw company's property and business the purchasers paid special attention to and developed a trade in school equipment machinery and furnishings for departments in manual training, drawing, labora-

tory work, etc. They later reorganized into a corporation known as the Grand Rapids School Equipment Company, dividing the stock equally. Schravesande was chosen president and financial manager; Fox, superintendent of manufacturing and general executive; Matheson, secretary, in charge of accounts and office work, and Fortier, treasurer, in charge of the sales department. Fortier himself was known as a good salesman and went upon the road more or less. He had under him, at the time to which this controversy relates, three salesmen, De Young, Mentzer and plaintiff, Reinhard. They were on the road much of the time, devoting their efforts mainly to selling school equipment in which defendant specialized. What other services they rendered is a matter in dispute. DeYoung had been with defendant from the beginning. In January, 1915, plaintiff, who had previously worked for another factory at the same salary, was employed by defendant at $250 per month to help in planning, bringing out and selling wood-working machinery and other equipment for manual training in educational institutions. In connection with Mentzer, who was then first employed, he designed and developed a lathe and forge which became a part of their school equipment line. In 1915 defendant's business reached $253,000 in school equipment with other work and sales amounting to $70,000 and the salaries of De Young and Mentzer were increased; but the world war was under way and business conditions became so disturbed that their school equipment line of trade, instead of increasing, fell to $218,000 in 1916, and other incidental work diminished, while De Young and Mentzer were asking for increased compensation.

In December of 1916 the outlook was such, especially in their school equipment line, that defendant's officers concluded to make some special effort to meet the situation and keep their business going success-

fully for the ensuing year. They could forecast to some extent the prospects of school business, as prospective school buildings and large jobs in that line were published in what is known as the "Dodge Reports." De Young, their oldest salesman, testified: "This we were able to get from the Dodge Reports list which we had, and we were able to tell almost a year in advance what the prospects were for business." Schravesande, the president of the company, also stated school business did not look very good for possibly two years to come on account of the war, as materials were going in other directions. The previous year's falling off and future prospects were discussed by the officers of the company among themselves and different plans suggested. The plan decided upon and presented to their sales force was for an increased effort to secure business, stimulated by a contingent increase of compensation. A meeting of the four members of the company and three salesmen was called early in January at which the situation was discussed, a proposition made by the company and an oral agreement for the ensuing year entered into, as is undisputed. The testimony of both sides harmonizes upon a contract under which the salesmen should remain for 1917 at their former salaries and a commission of 5% would be divided equally among the four members of the sales department, which included its manager, Fortier, on all sales made or orders taken during the year in excess of $200,000— either limited to school supplies and equipment only, as insisted by defendant, or upon anything which could be made or work which could be done at the factory in securing which the sales department was instrumental or had participated, as claimed by plaintiff.

Of an agreed contingent commission of 5% and to whom payable there is no disagreement. The distinct

issues of fact are over what the commission applied to and what was done by the sales department. Fortier, the sales manager, testified that he was one of the parties who were to participate in that commission if any was earned, but that it covered only school business. The three other officers of defendant testified in substance to the same effect, while plaintiff and the two other salesmen testified to its broader application. The conflicting testimony of the respective parties upon that issue is extended by long direct and cross-examinations out of which affirming and refuting arguments are extracted by counsel. There was abundant testimony on the part of plaintiff to fairly carry that issue of fact to the jury, as the following brief excerpts from his evidence sufficiently indicate:

"Mr. Fox said they wanted to fill the factory full of work, it didn't make any difference what it was, so long as they could make it in the factory.  *  *  *

"Q. Work on what?

"A. Selling the product of that company and any special equipment that they could manufacture  *  * * anything that they could manufacture in that plant that the sales force worked on. Mr. De Young asked him about figuring special jobs, and he said we could go out and hustle for anything that they could manufacture in that plant; that he would figure on it and if necessary he would go out and help us get it; that we would be given full credit for any special job that he figured and got, or that he figured for us and that we got."

De Young testified:

"Mr. Fox said they wanted to fill the factory with work, and 'go as far as you like.  *  *  *  If we can not make it in this factory we will farm it out.'  *  *  * They would take anything that they could make in the factory."

Mentzer testified:

"He says, 'get all the business you can, and if we can't make it here we will farm it out.' There wasn't any restrictions of any kind made on what the business was to be, whether it was bakoroasts, kitchen cabinets, or what it was, there was no restrictions. * * * No, to my knowledge, there wasn't a thing said about school equipment business; everything was talked of in general, to fill up the shop. * * * He told us that, practically one of the last things he said, 'now fellows,' he says, 'go to it, go as far as you like, fill the old shop full; the more you make the more we make; the more we make the more you make; there will be no hard feelings how much you make.' "

De Young testified:

"We was to have credit for anything the sales force could show they had spent any time on, written any letters, made quotations, called on customers or was in any way instrumental in landing the order. The only thing we were not to receive commission on was those orders that came in by mail unsolicited."

While specializing in school equipment business for which its salesmen were sent out to obtain contracts and orders, the evidence is undisputed that defendant handled six or seven other lines of articles turned out by its factory, such as kitchen cabinets, running boards for automobiles, banquet tables, mirror frames, certain hotel equipment, hand screws, show cases, bakoroasts, etc.

When this country declared war, April 6, 1917, and was proceeding to devote its energies and resources to active preparation, defendant, like thousands of other manufacturing institutions, both great and small, first placed its "factory at the disposal of the government," but without immediate results. Schravesande and Fox then went to Washington and, as Fortier testified, "laid out a line of work to follow up for them." He went to Washington in May where he remained for some time, and, as he states, "followed

out the routine," and war contracts followed eventually. He was there more or less in May, June and July, representing defendant, as he states, and on a trip "from May to June," he says, "I got an order for arms chests." The largest contract obtained by defendant was for 6,400 truck bodies at $195 each, not including crating which was for each body $6 additional. This was $12 a truck more than the International Harvester Company received on a large contract for all it was able to take. This truck body contract amounted to $1,248,000. Fortier testified that when figuring the cost the whole overhead for the year would naturally be figured in, but he had nothing to do with that. The orders received by defendant during 1917 amounted to $1,509,319. Plaintiff testified that Matheson in speaking of the matter stated in effect that the entire overhead for the whole year had been figured in on the truck contract.

It is claimed by plaintiff and denied by defendant that the sales department, or force, directly and indirectly worked upon and participated in securing the government orders, and that Fortier in particular, who was one of the four members of the sales department to whom the contract applied, effectually devoted much time and effort to the work of securing those large and profitable government jobs which filled the factory with business during that year, and longer. That question was also submitted to the jury by the court as an issue of fact. As to it defendant contends the testimony presented no legitimate issue for the jury within the purview of the contract even as testified to by plaintiff; and that as to both issues the verdict was against the great weight of evidence.

Of the testimony relative to Fortier's participation in securing the government contracts, defendant's contention is summed up in the statement that the bids were prepared by others, submitted according to de-

partment regulations and the fact that Fortier, an officer of the company—

"called at the quartermaster's office in Washington, to inquire whether or not awards had been made on the bid filed, and when the bid was announced wired his company of the award, does not constitute 'working' to obtain the contract or make the sale."

If he and defendant's president are to be credited that falls far short of being all he did. Fortier was recognized by the other officers of the company as a good salesman and had at times gone out to get special jobs like the other salesmen. Other officers of the company had expressed a wish that he might get out on the road oftener. It is undisputed that defendant's officers were anxious to secure sufficient government work to keep their factory busy. Schravesande stated he thought it would be a good thing to have Fortier "right down there" to see what he could get for the company, and in talking it over with plaintiff said, "We will send Fortier to Washington, let him stay down there and see what he can pick up." They did send him and he was there much of the time during May, June and July, working earnestly and successfully on the mission for which he was sent, as asserted by him and other officers of the company before this litigation arose. While there he kept in frequent communication by wire and mail with Schravesande and other officers of defendant. In replying to a letter from their president which he apparently construed as containing some criticism he pointed out that he was "of mature age," was there "to get business, not for pleasure," and said:

"When I left home you told me I was the man to do this job and get in. I am getting in and I want to say when I get to bed at night I am all in. * * * I assure you I am not spending any more than I have to as my habits are within the domain of conservative effort. * * * I feel I am giving every ounce of

energy I have to this problem and if you think I am not proceeding in accordance with your wishes I will welcome your criticism."

In a letter referring to arms chests orders and reporting one for over $17,000, he said: "I finally got this order through, the balance, which does not amount to much but will help." In another letter written after the large truck contract was secured he criticized a notice of the fact published in a Grand Rapids paper as having called "attention to things like being $12 higher than the International Harvester" and said, "I had hard enough work to get this order through without there being any come-back and I hope no one here sees this paper." Referring to an order for "the big field desk" which he understood from Fox they could "get out easily before the big contract started in 60 days," he wrote: "I would like to pick this up before coming in, and also a few others. Landed a contract for six tables yesterday at a good big price."

Lauding the work done by Fortier in securing those orders, Schravesande wrote him shortly before his return:

"I am inclined to think tnat when you come home, if you will telegraph us, the entire city will meet you with a brass band at the depot. The Grand Rapids Showcase Company have been at me two or three times to know whether or not you would undertake to represent them in Washington, and other concerns have asked me, now that we are filled up, you would be willing to get them some business. I have answered all those fellows that you were just about through in Washington and that I did not think you would consider making any connection with any one else, because we would need you in the factory."

This and other evidence as to what was said and done in that connection fairly raised an issue of fact for the jury as to whether Fortier worked upon and was instrumental in securing those war orders to

which their plant was almost exclusively given over thereafter. Plaintiff worked in the office while Fortier was away to secure the war orders, and attended to the correspondence usually handled by Fortier. He testified that later he worked on school equipment orders but was limited to machinery equipment, or stock business which was bought from other houses, saying, "They told me to go ahead and sell all that I could of that that didn't have to be made at the plant but to shut off on the other." De Young and Mentzer testified to similar instructions, and the latter, who was experienced and lauded as a "whirlwind" by Fortier, helped on the truck body contract. It was admitted that certain school equipment work was thereafter "farmed out" to another company.

Fortier was concededly a good salesman, at the head of the sales department and a member of the sales force, one of the four to work for and participate in whatever commission its combined efforts earned under the contract in question. The questions of what the disputed provision of the otherwise conceded contract was and in what manner or to what extent performed, were clearly made issues of fact by the conflicting testimony. Regarding those issues we cannot find as a conclusion of law that the verdict was against the overwhelming weight of evidence.

Defendant's lengthy and varied series of assignments against refusal of the court to charge as requested and failure to sufficiently instruct as to the elements of a contract, and proper construction of the contract under consideration cannot within reasonable bounds be reviewed in detail. In general it may be said that the burden of defendant's complaint and argument is that the charge was too general and meager of details as to the essential elements of the claimed contract, and in leaving it to the jury "to vaguely grope and guess" without proper instructions as to

the "facts and circumstances to be taken into consideration in determining the intent of the parties." The court did not elaborate in technical definitions or review the evidence to the jury, but did distinctly point out and plainly tell the jury what the disputed facts for them to decide were. The charge covers between 5 and 6 pages of the printed record, plainly states the nature of the litigation, the claims of the respective parties, the portion of the contract as to which they disagree, that the burden of proof rested upon plaintiff to establish his claim, and the duty of the jury to decide the concisely stated issues of fact submitted to them.

After stating one of the issues of fact to be, "Did the minds of the parties meet in mutual understanding or agreement?" And, if so, the proper "construction of such agreement in the light of the subject-matter," it is said in defendant's brief:

"We submit there can be no question under the evidence as to the understanding of these four men that the commission was to be based upon the volume of school business, and that the plaintiff and his associates so understood it. * * *

"The entire case rests upon the proposition to so construe an oral agreement for a commission, intended to be earned by plaintiff in the sale of school equipment, as to apply solely to a government contract unanticipated by the parties at the time of the agreement, no part of which commission was or could have been earned by claimant, and which bears no relation whatever in the nature of earning to a government contract."

Those contentions and many others argued for defendant are tinctured with the assumption that the facts are as defendant claims, seemingly ignoring the few but distinct and important issues of fact arising from the conflicting testimony of the parties present and participating in making the contract. Their dis-

agreement is not as to whether the minds of the contracting parties met, but upon what they met. The testimony of each side is positive, and as given leaves no room for misunderstanding as to what was said and agreed to. The issues of fact were clean-cut in that respect, and plainly presented to the jury in part as follows:

"If the plaintiff has not proven this contract to have been made as he claims, and by a preponderance of the evidence, that will be the end of this case and your deliberations therein and you will return a verdict of no cause of action. * * * It will be necessary for you to determine just what the contract was between these parties. * * * Upon what did the minds of these two contracting parties meet there upon that occasion? * * * Was it confined to school equipment or was it all orders for the manufacture and sale of products that these salesmen obtained or worked upon? In determining just what this contract was, whether as claimed by the plaintiff or as claimed by the defendant, you determine what the evidence shows took place between these men at the time that that contract was made. What was said by them? What was the understanding between them? You not only consider that, but you will also consider anything that was said after that by any of the parties there who took part in making said contract, as bearing upon what their understanding of it was, if there was anything afterwards said by any of them, that will aid you in determining just what these men agreed upon there at that time; and how these parties themselves construed that contract."

There was testimony for plaintiff tending to show how the parties themselves construed this contract after the matter of war contracts arose and efforts of the company were diverted from its regular lines. Shortly before this large truck order was obtained Schravesande said to plaintiff, "Just think, George, if we get this contract for trucks we will all be rich,"— and on at least two separate occasions Fortier told

Mentzer, who had bought a home on time and was struggling to pay for it, that his commission from the truck job alone would be enough to complete the payments on his home "and then some"; and towards the end of the year both Mentzer and De Young were told, "Don't be in a hurry. You won't get that commission until after this truck job is done."

The understanding of the parties to an oral contract is shown by the evidence of what was said at the time by the parties who made it—not by their secret thought but by their expressed intention. When their testimony conflicted it remained for the jury to determine what the contract was. *Durgin* v. *Smith*, 133 Mich. 331; *Hudson* v. *Transfer Co.*, 137 Mich. 255.

Shortly before Christmas, 1917, a dinner of rejoicing, attended with much hilarity and expressions of good fellowship, was given one evening at the Peninsular Club by the stockholders of defendant to its salesmen and bookkeeper. Envelopes containing Christmas greetings and a check for $500 each were placed at the plates of plaintiff, De Young and Mentzer, with one containing a $200 check at the plate of the bookkeeper. These they accepted as gifts and kept, being told as claimed by plaintiff's witnesses that the checks were given them as tokens of appreciation, both Fortier and Matheson saying, as Mentzer testified, "When this truck job is finished up you will be well taken care of." Defendant claims the gifts were qualified by a statement of Schravesande that no commissions were due the salesmen, which plaintiff and the other salesmen deny having heard. Error is urged on refusal of the court to instruct the jury that, if they found such statement was made by Schravesande, then—

"having accepted on that occasion $500 without objection, such acceptance is binding upon the plaintiff and must be considered an acceptance and payment of any amount which he might claim was due him for

211—Mich.—12.

commissions, there can be no recovery and your verdict must be no cause of action."

Not only was no affirmative defense of payment pleaded, but if Schravesande, who stated the occasion was accompanied by "a lot of joshing," did make the statement claimed it would not if heard by plaintiff inform him the token of appreciation was on condition that he accept it as a payment in settlement of any claim for commissions under his contract of hiring.

It is further contended for defendant that orders for war work were not within the purview of the contract and the minds of the parties could not have met upon that subject since this country had then neither declared nor was making preparation for war; that the term "orders" in connection with defendant's business at that time could not legally be construed to include "war contracts," and if so intended an agreement to pay a commission for procuring the same was illegal as against public policy and void, for which reasons its motion to strike out all testimony relating to government contracts and direct a verdict for defendant was erroneously denied. It is not shown or claimed by plaintiff that these parties at the time the agreement was entered into specified or had in mind government contracts, or any other definite contracts, jobs or sales. What they did have in mind and contract in relation to, according to plaintiff's evidence, was orders and contracts of any and every kind which would fill the factory with work and keep it running upon anything they could make in it. It certainly cannot be successfully contended that orders afterwards secured and accepted within the year which met those conditions were outside the contract because not in mind or in sight at the time of the agreement.

Upon the proposition that an agreement to compensate for procuring government contracts is against

public policy and void, defendant's counsel cite *Tool Co.* v. *Norris,* 2 Wall. (U. S.) 45, an early extreme authority to that effect, and *Crocker* v. *United States,* 240 U. S. 74 (36 Sup. Ct. Rep. 245), which applies the rule stated in the *Norris Case* to a situation where a corrupt secret agreement was made with a superintendent in the mail service in relation to procuring a government contract for letter carriers' satchels. Other Federal decisions are to be found somewhat along the same line; but that court has recognized the distinction between employment for services of a legitimate character in transacting business with the government and a contract to improperly influence government agents in the performance of their public duties (*Stanton* v. *Embrey,* 93 U. S. 548), and an examination of *Beal* v. *Polhemus,* 67 Mich. 130, with numerous other decisions in various jurisdictions, indicates as well supported the statement in 13 Corpus Juris, p. 435, that—

"this extreme doctrine (as stated in the *Norris Case*) is not generally followed, and the right of all persons to be heard before an officer or department of government through agents has been affirmed, and the legality of contracts for the employment of legitimate agents for negotiating business with the government has been sustained where no corrupt influences were to be used by the agent, and the agency is disclosed, even though compensation is contingent on success."

There is no proof or claim here that the contract of hiring contemplated any illicit methods or that any corrupt influences were used in securing government contracts. Fortier was not only the disclosed agent and sales manager but an officer of the defendant corporation, which could only transact business through its officers and agents. The parties to this contract saw fit to let it rest in parol subject to the memory and credibility of those who made it. Their conflicting testimony as to certain of its provisions raised

issues of fact controlling in this contention which in their final determination were strictly within the province of the jury to decide. The case was well tried by counsel and fairly submitted to the jury upon the facts in dispute.

The judgment is affirmed.

MOORE, C. J., and BROOKE, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.